UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| EDWARD J.S. PICARDI M.D., | 3:18-CV-03014-RAL |
| Plaintiff, | |
| vs. | OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| U.S. ATTORNEY'S OFFICES, PIERRE, SD DEPT. OF JUSTICE;   U.S. ATTORNEY'S OFFICES, RAPID CITY, SD DEPT. OF JUSTICE; AND U.S. ATTORNEY'S OFFICES, SIOUX FALLS, SD DEPT. OF JUSTICE; | |
| Defendants. | |

On August 13, 2018, Plaintiff Dr. Edward J.S. Picardi (Picardi) filed a pro se complaint alleging that the U.S. Attorney's Offices in Pierre; Rapid City; and Sioux Falls, South Dakota (USAOs) failed to comply with four Freedom of Information Act (FOIA) requests and asking that this Court compel those offices to produce the requested documents. Doc. 1. After an initial round of cross-summary judgment motions, Docs. 8, 25, this Court denied Picardi's summary judgment motion and stayed the Defendants' motion while the Defendants processed Picardi's FOIA requests. Doc. 37. In the summer of 2021, the parties updated this Court regarding the status of Picardi's FOIA requests. Docs. 47, 48. Picardi filed a motion to compel disclosure and resisted dismissal of the case. Doc. 51. The Defendants then filed a second motion for summary judgment. Doc. 52. For the reasons stated below, this Court denies Picardi's motion to compel and grants Defendants' motion for summary judgment.

## I.      Factual Background

### A. Procedural History

The facts underlying this case date back more than six years, and both Picardi and the USAOs have given their versions of events through statements of undisputed material facts and responses to one another's motions. Docs. 23, 27, 30, 32, 51, 54.[1] The following facts are not in dispute.

In October 2012, Picardi was convicted of felony tax fraud and other related crimes in the Western Division of the United States District Court for the District of South Dakota. Docs. 1-2, 17 at 4.  Following his sentencing, Picardi served time at the Federal Prison Camp in Yankton, South Dakota.  Doc. 8-1.  While there, Picardi submitted a series of FOIA requests to the Executive Office for United States Attorneys (EOUSA) seeking documents maintained by the USAOs in Rapid City and Sioux Falls, which related to his criminal and civil tax trials. Doc. 8-1.  The EOUSA is the office within the United Stated Department of Justice responsible for processing FOIA and Privacy Act requests relating to United States Attorney's Offices across the country. Docs. 27 at ¶ 12, 54 at ¶ 2.  In each of these requests, Picardi promised to pay up to $25 in fees and listed his address as Yankton Prison Camp. Doc. 8-1.

Picardi's first request was dated February 19, 2014. Docs. 8-1 at 1, 54 at ¶ 3.  EOUSA received this request, but informed Picardi it could not process it because of an absence of the

---

[1] Picardi responded to this Court's order for a status update, Docs. 50, 51, but did not respond to Defendants' second motion for summary judgment and statement of material facts.  Docs.  52, 54. Rule 56.1(D) of this District's local rules states: "[a]ll material facts set forth in the movant's statement of material facts will be deemed to be admitted unless controverted by the opposing party's response to the moving party's statement of material facts."  D.S.D. Civ. LR 56.1(D). Although this opinion and order draws upon the statement of facts set forth in both the Defendants' and Plaintiff's pleadings, it could simply take as true the Defendants' statement of facts in Doc. 54, which accompanied its second motion for summary judgment, Doc. 52.

2

required certification of identity. Docs. 27 at ¶ 15, 54 at ¶ 4. Thereafter, Picardi submitted four requests for documents which complied with the submission requirements published in the Federal Register. Docs. 8-1, 27. The accepted requests were dated April 17, 2014; April 20, 2014; June 2, 2014; and July 20, 2014. Docs. 8-1, 27 at ¶ 16, 20, 22, 24. EOUSA sent Picardi letters to his Yankton Prison Camp address notifying him of the receipt of these requests, advising him of the request tracking number, and informing him that fees may be required for search time and duplication costs. Docs. 8-1 at 7, 20, 28; 27 at ¶ 17, 21, 23, 25. These letters also informed Picardi that large requests usually take about nine months to process. Doc. 8-1. Picardi received three of these letters. Doc. 8-1. The EOUSA and USAOs combined Picardi's four requests into a single file and treated it as a request for all files relating to his cases. Doc. 27 at ¶ 26.

Picardi filed multiple FOIA appeals with the Office of Information Policy (OIP) in 2014 because he had not received further responses from the EOUSA office regarding his requests. Docs. 8-1, 27, 54 at ¶¶ 7-8. These requests were dated July 14, 2014; August 10, 2014; and October 26, 2014. Docs. 8-1 at 8, 21, 30-32; 27 at ¶ 27. The OIP responded to the first two appeals with letters dated August 14, 2014, and September 19, 2014, which informed Picardi that the OIP could not consider the appeal because the EOUSA was still processing the request and had not yet reached an adverse determination. Doc. 8-1 at 12, 24. These letters also informed Picardi that FOIA allows "requesters to file a lawsuit when an agency takes longer than the statutory time period to respond." Doc. 8-1 at 12, 24. The OIP responded to Picardi's third appeal by letter dated November 19, 2014, which referenced a letter the EOUSA sent to Piardi dated October 27, 2014. Doc. 8-1 at 40. The letter instructed Picardi to contact EOUSA's Requester Service Center for updates about his requests. Doc. 8-1 at 39.

In that letter sent to Picardi's Yankton Prison Camp address and dated October 27, 2014, the EOUSA notified Picardi that it had conducted an initial search for responsive documents. Docs. 8-1 at 34; 27 at ¶ 29, 54 at ¶¶ 20-21. The EOUSA estimated that the processing component would have to review tens of thousands of physical pages to process Picardi's request. Docs. 8-1 at 34; 27 at ¶ 29, 54 at ¶ 21. The letter estimated the cost of processing the request as $2,190.00 and directed Picardi to pay the fee in advance. Docs. 8-1 at 34; 27 at ¶ 29, 54 at ¶ 21. The letter warned that the request would not be processed until payment was received and the request would be closed if he failed to respond within 30 days. Docs. 8-1 at 34; 27 at ¶ 29, 54 at ¶ 21. The letter offered Picardi the opportunity to reduce his fees by reformulating or limiting his request and notified him of his right to appeal the decision to the OIP. Doc. 8-1 at 34. In bolded print, the letter stated, "your request is not considered received until we receive a response from you." Doc. 8-1 at 34.

Picardi submitted a letter dated November 12, 2014, to the EOUSA attempting to reduce the scope of his request in order to lower the estimated fee. Doc. 8-1 at 36-37; 27 at ¶ 30, 54 at ¶ 22.

The Office of Government Information Services (OGIS), the entity which provides ombudsman services regarding the FOIA, sent a letter dated May 28, 2015, to Picardi in response to a January 24, 2015, request for assistance that he submitted. Docs. 8-1 at 42; 27 at ¶ 31, 54 at ¶ 23. The OGIS informed Picardi that EOUSA either had closed or would be closing his files due to his failure to respond to its fee request of October 27, 2014. Docs. 8-1 at 42; 27 at ¶ 31, 54 at ¶ 23. After receiving a copy of Picardi's letter attempting to reduce fees, the OGIS forwarded it to the EOUSA so that it could update the fee estimate. Docs. 8-1 at 45, 27 at ¶ 32. In its

4

communication to Picardi, the OGIS informed him that the "EOUSA will contact you directly about this matter." Doc. 8-1 at 45.

The EOUSA sent a letter dated September 25, 2015, to Picardi at his Yankton Prison Camp address notifying him that his request file had been closed because he had not responded to the advanced payment request in its October 27, 2014, letter. Docs. 8-1 at 41, 27 at ¶ 33, 54 at ¶ 25. Picardi appealed this determination to the OIP. Docs. 8-1 at 50; 27 at ¶ 34. By letter dated February 22, 2016, Picardi contacted the OIP inquiring about the status of this FOIA appeal. Doc. 8-1 at 50. In this letter, he provided the OIP with an updated mailing address in Sturgis, South Dakota. Doc. 8-1 at 50. The OIP informed Picardi by letter dated May 13, 2016, that in response to his appeal, it remanded the request to the EOUSA for further consideration of the fee estimate. Docs. 8-1 at 53; 27 at ¶ 36, 54 at ¶ 28. This letter instructed Picardi to direct inquiries about the status of the remand to the EOUSA directly. Doc. 8-1.

An updated fee determination letter dated April 20, 2017, was sent by the EOUSA to Picardi at his Yankton Prison Camp address, the last address the EOUSA had on file for him. Docs. 27 at ¶¶ 37-38; 29-18; 29-19, 54 at ¶¶ 29-30. This letter identified additional documents that the processing office would search in response to Picardi's request and estimated the processing fee as $4,497.70. Docs. 29-18, 54 at ¶ 29. This letter again informed Picardi that his response would not be considered received and the component would not continue processing the request until he paid the fee. Docs. 29-18, 54 at ¶ 29. The letter was returned to the EOUSA as unable to forward, and the EOUSA was unable to find an alternative address for Picardi after running a search on the United States Bureau of Prisons "Find an Inmate" webpage. Docs. 29 at ¶ 33; 29-19; 29-20, 54 at ¶ 30.

Picardi again contacted the OIP by letter in early 2018 and asked for an update on his appeal because he had not received correspondence from them in more than a year. Doc. 8-1. Picardi filed this lawsuit on August 13, 2018. Doc. 1. The EOUSA sent the same fee determination letter that it had sent in April 2017 to Picardi's Sturgis address, which it received from the OIP, on September 6, 2018, renewing its request for advanced payment of the $4,497.90 fee before it would continue processing Picardi's request. Docs. 29 at ¶ 35, 54 at ¶ 32. Picardi filed for summary judgment on December 28, 2018. Doc. 8.[2] The Defendants answered the complaint on March 15, 2019, Doc. 17, and filed for summary judgment on June 28, 2019.

In its brief in support of its motion for summary judgment, USAOs confirmed that the EOUSA would process Picardi's request if he submitted the necessary fees in advance. Docs. 26 at 18; 34 at ¶ 6. A check dated July 7, 2019, for the total amount of the estimated fee had been received by the EOUSA as of July 30, 2019. Doc. 35.

Following this Court's Order Denying Motions for Summary Judgment on September 30, 2019, Doc. 37, Picardi filed a Motion for Release of 2005 Grand Jury Transcripts, Doc. 38, related to a case in which Picardi served as a witness. Picardi's motion argued that he sought information to corroborate that an assistant U.S. attorney, Mara Kohn ("Kohn"), was part of a "deep state" conspiracy against him because she made offers on Picardi's residence that he refused and because she donated to Democratic candidates while Picardi was personally funding advocacy campaigns against "Hillarycare" and "Obamacare." Doc. 38. The Defendants filed a Motion to Seal Documents, Doc. 39, seeking an order from this Court to allow disclosure of the grand jury material Picardi sought to the civil division of the USAO in order to process the FOIA request. This Court on February 12, 2020 denied Picardi's motion for release of grand jury records, and

---

[2] Picardi, however, did not file his statement of material facts until June 3, 2019. Doc. 23.

granted Defendants' request for disclosure of the grand jury materials to its civil division to be used only to process Picardi's FOIA request. Doc. 41.

Due to over a year of inactivity, this Court on June 8, 2021, under Rule 41(b), ordered the parties to advise whether this case may be dismissed, or alternatively, to file whatever motions or documents framing any remaining issue for determination by this Court. Doc. 46.  Picardi responded by requesting this Court to refrain from dismissing the case and by filing a motion to compel compliance of the FOIA request. Doc. 47.

In response to this Court's order for a status update, Doc. 46, the Defendants advised that the EOUSA had made twelve disclosures in relation to Picardi's FOIA requests. Docs. 48, 54 at ¶ 85. The Defendant noted that the unprocessed pages consisted of tax records and information the USAO considered outside the scope of Picardi's FOIA request. Docs. 48, 49.  In total, the Defendants indicated in their latest pleading that the EOUSA had reviewed over 90,000 pages for responsiveness and produced 7,555 pages of records to Picardi. Doc. 54 at ¶ 86. The Defendants also filed and sent to Picardi a "Vaughn" index to "identify the materials withheld pursuant to FOIA and the grounds for each withholding." Docs. 48, 55-1.

This Court filed another order for a status update on September 1, 2021. Doc. 50.  Picardi responded with a renewed request to this Court to order Defendants to produce all material related to his FOIA requests. Doc. 51.  Defendants have moved for summary judgment. Doc. 52.

**B. The FOIA Search Process**

Picardi's FOIA requests were processed in the USAO-SD by Legal Assistant Deborah Gilman and AUSA SaraBeth Donovan. Docs. 54 at ¶ 46, 56, 57. Gilman is a legal assistant with the USAO-SD's Appellate Division. Doc. 54 at ¶ 47. She has been employed by the USAO-SD since May 13, 2018. Doc. 54 at ¶ 47.  As part of her duties, she also assists with FOIA matters.

7

Doc. 54 at ¶ 47. Her responsibilities in that capacity include coordinating with the EOUSA regarding FOIA requests for records located in the USAO-SD. Doc. 54 at ¶ 47. On August 21, 2019, Gilman began the search for responsive records based on Picardi's request letter to FOIA dated September 22, 2018. Doc. 54 at ¶ 48. In that letter, Picardi lists four categories of information being sought: (1) surveillance; (2) "final discovery CD used for trial expected to reveal the level of incompetence of the defense lawyer who falsely claimed experience in tax law"; (3) contacts with the Zimmionds; and (4) information involving AUSA Mara Kohn. Doc. 54 at ¶ 48.

The USAO-SD has in its possession 13 banker boxes containing documents and CDs relating to <u>United States v. Picardi</u>, 5:10-cr-50092-JLV (D.S.D.), and Picardi's subsequent criminal and civil appeals, as well as approximately 90,058 pages of electronic documents. Doc. 54 at ¶ 49. It was determined by the USAO-SD that the initial search would focus on the trial exhibits and discovery. Doc. 54 at ¶ 49. Gilman hand searched through each of the 13 boxes and scanned what she found on August 21-23, 2019, August 26-28, 2019, and September 4-6, 2019. Doc. 54 at ¶ 50. During that search, Gilman looked for documents referencing or related to the following search terms: "surveillance," "Lori," "Lori Zimmiond," "Richard," "Richard Zimmiond," "Zimmiond," "Mara," "Mara Kohn," "discovery," and "trial exhibits." Doc. 54 at ¶ 50. The result of that initial search produced 322 trial exhibits marked by the government, for a total of 6,000 pages. Doc. 54 at ¶ 50. Gilman did not locate the defendant's exhibits. Doc. 54 at ¶ 50. There were no results relating to "surveillance," "Lori Zimmiond," "Richard Zimmiond," or "Mara Kohn." Doc. 54 at 50.

On September 9, 2019, Gilman conducted a second search of the 13 boxes of documents and excluded the government's trial exhibits. Doc. 54 at ¶ 51. The terms used for this search were "surveillance," "search warrant," "Lori Zimmiond," "Lori," "Zimmiond," "Richard Zimmiond,"

"Richard," "Mara Kohn," "Mara," and "Kohn." Doc. 54 at 51. No documents were found. Doc. 54 at ¶ 51. Further, Ms. Gilman did not find documents pertaining to a search warrant or surveillance conducted on Picardi himself, his house, or his business. Doc. 54 at ¶ 51. On September 17, 2019, Gilman concluded the search for records in the remaining boxes using the same search terms and information above. Doc. 54 at ¶ 52. Gilman found no responsive records. Doc. 54 at ¶ 52.

On September 17, 2019, Gilman emailed AUSA Kevin Koliner and IT Systems Manager James Lichty to request that they conduct a search of emails in the possession of either AUSA Koliner or former AUSA Robert Mandel. Doc. 54 at ¶ 53. Attorneys Mandel and Koliner were assigned to Picardi's criminal matter and post-conviction matters, respectively. Doc. 54 at ¶ 53. AUSA Koliner confirmed that he had emails pertaining to Picardi, and they were loaded into a separate and distinct location for the FOIA team to review. Doc. 54 at ¶ 53. Systems Manager Lichty confirmed that DOJ email archives go back only three years, and any emails before that time had been deleted. Doc. 54 at ¶ 53. Lichty therefore confirmed that Robert Mandel's emails had already been deleted, as he retired from the U.S. Attorney's Office in 2012. Doc. 54 at ¶ 53.

On September 23, 2019, Gilman contacted legal assistant Lori Climis, who assisted AUSA Mandel in Picardi's criminal investigation and indictment. Doc. 54 at ¶ 54. Climis confirmed that she had no electronic documents in her possession relating to Picardi's criminal matter. Doc. 54 at ¶ 54. On September 27, 2019, Gilman uploaded documents to the EOUSA for processing. Doc. 54 at ¶ 55. Those documents consisted of the government trial exhibits. Doc. 54 at ¶ 55. Ultimately, those documents were not processed by the EOUSA, as Picardi indicated he did not want to receive them. Doc. 54 at ¶ 55.

On October 17, 2019, Gilman reviewed the electronic Picardi documents in the IPRO software program for search terms "Richard and Lori Zimmiond" and "Mara Kohn." Doc. 54 at ¶ 56. The search resulted in one document, which was a copy of a South Dakota Supreme Court Opinion in Picardi v. Zimmiond, 693 N.W.2d 656 (S.D. 2005). Doc. 54 at ¶ 56. On October 18, 2019, Gilman went back into the hard copy file box containing discovery and obtained CDs and DVDs possibly relevant to Picardi's request. Doc. 54 at ¶ 57.

On October 22, 2019, Picardi met with Donovan, Gillman, AUSA Stephanie Bengford and EOUSA attorney-advisor Justin Wilkinson to discuss his FOIA requests in an attempt to clarify and/or narrow the requests. Doc. 54 at ¶ 58. At the meeting, Picardi indicated he believed there was a 1994-1995 investigation in which the USAO-SD office was involved. Doc. 54 at ¶ 59. He requested any items produced during the 1994-1995 investigation that led to the 2010 indictment. Doc. 54 at ¶ 59. Picardi stated it was his belief that former AUSA Mara Kohn was involved in matters leading up to the 2005 Grand Jury. Doc. 54 at ¶ 59. Plaintiff also believed Lori Zimmiond was present during the entire criminal trial and that an interview with Lori Zimmiond must have occurred pretrial. Doc. 54 at ¶ 59. Picardi wanted a copy of the interview if it existed. Doc. 54 at ¶ 59. Picardi stated that he was not interested in obtaining certain documents in response to his FOIA requests, including trial exhibits, trial transcript, or court records from his criminal trial; his tax returns or W-2s; documents regarding overseas entities; documents obtained from a search warrant on Kritt's property (except for any surveillance); letters to or from Kritt; or anything relating to Blenheim, Oak Ridge, RCMC, IBC, Elfin, and E&S International Ltd. Doc. 54 at ¶ 60. They also discussed the large volume of records that were to be searched, and Picardi agreed to provide a list of search terms to assist in locating any relevant records. Doc. 54 at ¶ 61. By email dated October 23, 2019, Picardi provided the following words and phrases for excluding records

10

in the search: "Kritt search warrant," "Elfin," "Blenheim," "Montrain," and "Brodnik." Doc. 54 at ¶ 62.

In January 2020, Gilman provided the above-listed discovery CDs to AUSA Donovan, and the 13 boxes of documents were transferred to the USAO-SD's Rapid City office for Donovan's review. Doc. 54 at ¶ 63.  In reviewing paper and electronic records and drafting responsive pleadings, Donovan determined that due to both the expansive breadth of a portion of Picardi's request (i.e. "discovery"), as well as the specific nature of other portions of his requests (i.e. surveillance, Zimmionds, Mara Kohn), combined with the large and cumbersome volume of records contained within various forms of media (CDs, DVDs, network files, and paper files), the best way to ensure a complete and thorough search for responsive records would be to review all of the paper and electronic files in the possession of the USAO-SD, which might contain records responsive to Picardi's requests. Doc. 54 at ¶ 65.  Donovan stated by affidavit that she searched the following:

> (1) paper records contained in thirteen (13) cardboard boxes and a plastic container of files, which included paper records from criminal case files 5:10-cr-50092-JLV and 5:13-CR-05035-JLV, as well as Plaintiff's appeal of his criminal conviction and various other civil cases involving Plaintiff; (2) multiple CDs and DVDs included in the thirteen cardboard boxes and plastic container, including those marked "discovery" and "Kritt Computer Files"; (3) other files and records in the USAO-SD that might have contained potentially responsive records, including a criminal case file from 2000 in which Plaintiff was a witness as the treating surgeon; (4) the computer network drive of AUSA Kevin Koliner, the prosecutor assigned to Plaintiff's criminal case number 5:10-cr-50092-JLV who took the case to trial; (5) the electronic mail of AUSA Koliner related to Plaintiff; and (6) electronic files stored in the USAO-SD's electronic "IPRO" database for case number 5:10-cr-50092-JLV, which was utilized by the USAO-SD to process records, respond to discovery, etc.

Doc. 54 at ¶ 66.  Donovan confirmed with the legal assistant and AUSA involved in Picardi's criminal case that all electronic files contained on the CDs and DVDs were also contained in the electronic database IPRO. Doc. 54 at ¶ 67.  AUSA Donovan also spot-checked the CDs and DVDs to make sure the records contained therein were also contained in IPRO (and later in the USAO-SD's electronic database "Eclipse"). Doc. 54 at ¶ 67.

11

After Donovan reviewed the electronic records in the IPRO database to get a sense of what was there, she determined that the IPRO program would not allow her to effectively and efficiently review the voluminous records for responsiveness, create a paper trail of her work for later review and/or explanation of her processing, or easily or effectively produce the responsive records to EOUSA for further processing. Doc. 54 at ¶ 68. She thereafter had the files transferred to the USAO-SD's "Eclipse" electronic database that was just starting to be utilized in the USAO-SD. Doc. 54 at ¶ 69. In January 2020, the staff of the USAO-SD, including Donovan, received general training on the Eclipse program, including searching, tagging, and production. Doc. 54 at ¶ 70. In February, March, and April of 2020, Donovan reviewed and tagged every record contained in the Eclipse database set up for this case, by relevant subject matter, to determine which records were responsive to Picardi's FOIA requests. Doc. 54 at ¶ 71. Donovan tagged records by searching the exclusion terms provided by Picardi in his email dated October 23, 2019. Doc. 54 at ¶ 71. Donovan also sought transcripts from the 2005 Grand Jury proceedings involving Picardi but discovered the proceedings had not been transcribed. Doc. 54 at ¶¶ 82-83.

## II.   Standard of Review

When considering a motion for summary judgment, a court shall grant the motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding whether there is a genuine dispute of material fact, the Court must view the evidence and make reasonable inferences in the light most favorable to the nonmoving party. Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009) (quoting Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007)). "'FOIA cases typically and appropriately are decided on motions for summary judgment.'" Muckrock,

LLC v. Cent. Intelligence Agency, 300 F. Supp. 3d 108, 118 (D.D.C. 2018) (quoting Judicial Watch, Inc. v. Dep't of the Navy, 25 F. Supp. 3d 131, 136 (D.D.C. 2014)).

"In a FOIA case, summary judgment is available to a defendant agency where 'the agency proves that it has fully discharged its obligations under FOIA, after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester.'" Missouri Coal. For Env't Found. v. U.S. Army Corps of Engineers, 542 F.3d 1204, 1209 (8th Cir. 2008) (quoting Miller v. U.S. Dep't of State, 779 F.2d 1378, 1382 (8th Cir. 1985)). "In order to discharge this burden, the agency must prove that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements." Miller, 779 F.2d at 1382–83 (cleaned up and citation omitted).

## III.   Discussion

As stated previously, Picardi groups his FIOA requests into four subcategories: (1) surveillance materials related to a 1994 investigation into tax fraud, (2) a copy of an exhibit DVD from Picardi's criminal trial which had been provided to Picardi's lead counsel, Jennifer Culotta, (3) any files regarding the involvement of two of Picardi's neighbors, Lori and Richard Zimmiond, relative the tax fraud investigation, and (4) any documents related to former AUSA Mara Kohn whom Picardi has alleged offered to purchase property from him and is involved in a "deep state" conspiracy to the detriment of Picardi. Docs. 47, 51. Picardi also requested access to grand jury transcripts from 2005 where he testified as a witness. Docs. 38, 47, 51. He alleges that the Defendants have not produced his requested documents in good faith. Doc. 51. The Defendants respond that they have conducted a "reasonable search," have complied with and produced documents related to the disclosure requests, stated that the requested material does not exist or was destroyed, or claimed an exemption pursuant to 5 U.S.C.A. § 552(b). Doc. 53.

13

The FOIA was designed to increase openness and transparency in government, and it favors disclosure. Milner v. Dep't of Navy, 562 U.S. 562, 565 (2011). Because the FOIA promotes openness, the statute contains strict timelines with specific, limited exceptions. See 5 U.S.C. §§ 552(a)(6)(A)-(C). "FOIA thus mandates that an agency disclose records on request, unless they fall within one of nine exemptions." Id. "These exemptions are explicitly made exclusive, and must be narrowly construed." Id. (cleaned up and citations omitted).

### A. Reasonableness

"The adequacy of an agency's search for requested documents is judged by a standard of reasonableness, i.e., the agency must show beyond material doubt . . . that it has conducted a search reasonably calculated to uncover all relevant documents." Miller, 779 F.2d at 1383 (cleaned up and citation omitted). While the search conducted must be reasonable, it need not be exhaustive. Id. "An agency may prove the reasonableness of its search through affidavits of responsible agency officials so long as the affidavits are relatively detailed, nonconclusory, and submitted in good faith." Id. "Agency affidavits are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." SafeCard Servs., Inc. v. S.E.C., 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citation omitted).

Despite the reliability to be accorded to agency affidavits, "the burden remains on the government to demonstrate that it has thoroughly searched for the requested documents where they might reasonably be found." Miller, 779 F.2d at 1383. If, however, the agency has failed to make this showing, "then the requester can avert a motion for summary judgment merely by demonstrating some reason to think that the document would have turned up if the agency had looked for it, e.g., by showing that the document originated with the agency or that the agency is set up to retrieve just that kind of document." Id.; see Jud. Watch, Inc. v. U.S. Dep't of Homeland

14

Sec., 857 F. Supp. 2d 129, 139 (D.D.C. 2012) (cleaned up and citation omitted) ("If the plaintiff provides sufficient evidence to raise substantial doubt concerning the adequacy of [the agency's] search, particularly when there are well defined requests and positive indications of overlooked materials, summary judgment is inappropriate."). "But once the agency has shown by convincing evidence that its search was reasonable, i.e., that it was especially geared to recover the documents requested, then the burden is on the requester to rebut that evidence by a showing that the search was not in fact in good faith." Id. "Summary judgment would be improper if the adequacy of the agency's search were materially disputed on the record, for such a dispute would indicate that material facts were still in doubt." Id. "[I]n the absence of countervailing evidence or apparent inconsistency of proof, affidavits that explain in reasonable detail the scope and method of the search conducted by the agency will suffice to demonstrate compliance with the obligations imposed by the FOIA." Jud. Watch, Inc., 857 F. Supp. 2d at 139.

Picardi alleges that the search was not conducted in good faith because the USAO did not divulge all information to the EOUSA. Doc. 51. Picardi alleges that surveillance photos of his property that he acquired independently of the EOUSA disclosure prove "bad faith" on the part of the Defendants.[3] Here, the agency has demonstrated they conducted a reasonable search. To support its contention that the search was reasonable, the Defendants offered three affidavits from staff with the EOUSA and USAO involved in Picardi's FOIA request: Justin Wilkinson, SaraBeth Donovan, and Deborah Gilman. Docs. 55, 56, 57. The Defendants also filed an affidavit from

---

[3] This Court notes that the surveillance photos Picardi offers are undated and contain no context or identifying marks to indicate when, where or by whom they were created by or for what purpose. Doc. 51-1 through 51-9. However, former USAO SaraBeth Donovan seemed to confirm that investigators took photos of Picardi's residence at some point during the criminal investigation, although they contend the photos were not surveillance. Doc. 56 at ¶¶ at 17-19.

Jean Marie Carlson, the court reporter in Rapid City, South Dakota, who recorded stenographic testimony during the 2005 grand jury. Doc. 58.

As outlined in the declarations by the Defendants, the FOIA inquiry was extensive. SaraBeth Donovan, a former U.S. Attorney who assisted with the defense in this case and reviewed material subject to the FOIA request, stated that she determined "the best way to ensure a complete and thorough search for responsive records would be to slog through all of the paper and electronic files in the possession of the USAO-D.SD, which might contain records responsive to Plaintiffs requests." Doc. 56 at ¶ 8. Donovan stated that she searched

> 1) paper records contained in thirteen (13) cardboard boxes and a plastic container of files which included paper records from criminal case files 5:10-cr-50092-JLV and 5:13-CR-05035-JLV, as well as Plaintiffs appeal of his criminal conviction and various other civil cases involving Plaintiff; 2) multiple CDs and DVDs included in the thirteen cardboard boxes and plastic container, including those marked "discovery" and "Kritt Computer Files"; 3) other files and records in the USAO-D.SD that might have contained potentially responsive records, including a criminal case file from 2000 in which Plaintiff was a witness as the treating surgeon; 4) the computer network drive of AUSA Kevin Koliner, the prosecutor assigned to Plaintiffs criminal case number 5:10-cr-50092-JLV and who took the case to trial; 5) the electronic mail of AUSA Koliner related to Plaintiff; and 6) electronic files stored in the USAO-D.SD's electronic "IPRO" database for case number 5:10-cr-50092-JLV, which was utilized by the USAO-D.SD to process records, respond to discovery, etc.

Doc. 56 at ¶ 9. In October 2019, Donovan and others from the USAO and the EOUSA met with Picardi to optimize his FOIA request. Doc. 56 at ¶ 11. Picardi provided several search terms which were subsequently utilized. Doc. 56 at ¶¶ 11-15. Donovan stated that records deemed responsive based on the search terms provided by Picardi were subsequently uploaded to the EOUSA by the USAO for direct response to Picardi. Doc. 56 at ¶ 15. Donovan's declaration also addressed Picardi's request for information related to "surveillance," Lori or Richard Zimmiond, and Kohn. Doc. 56 at ¶¶ at 17-19. Donovan stated that a search of the records and discussions with the U.S. attorney involved in Picardi's prosecution indicated that no surveillance existed beyond photos of

16

Picardi's property and that neither the Zimmionds nor Kohn were involved in his prosecution. Doc. 56 at ¶¶ at 17-19. The declaration from Debbie Gelman, a legal assistant with the USAO, confirms how the search was conducted, often by hand or determining if applicable CDs possessed by the USAO contained relevant information. Doc. 57. Gelman testified that she did not locate any records of the defendant's exhibits in USAO's possession, and no results were discovered related to the search terms "surveillance," "Lori Zimmiond," "Richard Zimmiond," or "Mara Kohn" despite multiple attempts. Doc. 57 at ¶¶ at 4-6. When Gelman attempted to contact the former U.S. attorneys involved in Picardi's prosecution, AUSA Kevin Koliner and Robert Mandel, she either found and uploaded relevant records for review to the EOUSA or discovered they did not exist.[4] Doc. 57 at ¶ at 7. Based on these declarations that detail the USAO and the EOUSA's extensive efforts to locate and produce information related to Picardi's FOIA requests, this Court finds their search reasonable.

### B. FOIA Exemptions

As part of its search inquiry, Defendants compiled a "Vaughn Index" listing the files and documents that Defendants contend are excused from Picardi's FIOA request pursuant to the exemptions listed in 5 U.S.C.A. § 552(b). See Missouri Coal, 542 F.3d at 1209 (cleaned up and citation omitted) ("To help determine whether a governmental agency has discharged its burden under FOIA, Vaughn indices may be used."). Vaughn indices "ensure an 'effectively helpless' party's right to information is not submerged beneath governmental obfuscation and mischaracterization and . . . permit the court system effectively and efficiently to evaluate the

---

[4] Records from USAO Mandel had been deleted pursuant to the record retention policy of the USAO. Doc. 57 at ¶ 7.

factual nature of disputed information." Id. (cleaned up and citation omitted). The Eighth Circuit has held that a proper Vaughn index:

> provides a specific factual description of each document sought by the FOIA requester. Specifically, such an index includes a general description of each document's contents, including information about the document's creation, such as date, time, and place. For each document, the exemption claimed by the government is identified, and an explanation as to why the exemption applies to the document in question is provided.

Id. "Such an index allows both the district court and the requesting party to evaluate the decision to withhold records and ensure compliance with FOIA." Id. at 1210. "Generally, a more substantial Vaughn index—one that provides for each document requested a specific explanation as to why an exemption applies—is preferable to a bare bones index." Id. However, "[i]f the material is fairly described and the reason for nondisclosure is adequately stated and supported by the law, the agency's position should be upheld without *in camera* inspection." Id.

Here, Defendants' Vaughn index is detailed and substantial as it identifies the basis for each withholding and whether the redactions have been applied whole or in part. See Doc. 55-1. It also categorizes the information that has been withheld, and where applicable, notates the document's author, recipient, and date of creation.

### 1. Exemption 3

Defendants argue against disclosure of a 67-page grand jury transcript listed in the Vaughn index based on 5 U.S.C.A. § 552(b)(3), which prohibits disclosure of information that has been exempted by statute provided the statute "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" or "establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3), Doc. 53 at 28. Rule 6 of the Federal Rules of Criminal Procedure governs grand jury proceedings. Federal Rule of Criminal Procedure 6(e)(2)(B) prohibits the disclosure of grand jury material by

government employees including court reporters and government attorneys.  According to Federal Rule of Criminal Procedure 6(e)(E)(i) and (ii), a court may authorize disclosure "preliminarily to or in connection with a judicial proceeding," or "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury."

This Court does not see good reason in this FOIA case to disclose grand jury material leading to Picardi's indictment or the 2005 grand jury transcript in which Picardi testified as a witness.  Picardi alleges that animosity between himself and former AUSA Kohn spawned a criminal investigation against him. Doc. 47 at 4.  Picardi wants the grand jury material to understand Kohn's role in his indictment. Doc. 47 at 4.  He also requests grand jury transcripts related to a 2005 grand jury, in which Picardi served as a grand jury witness, to elicit similar information related to his indictment and subsequent criminal prosecution. Doc. 38.  Picardi cites to records that prove Kohn made an offer on his property, Doc. 8-1 at 73-79, but fails to establish that any supposed animosity from Kohn influenced a criminal investigation into his taxes.  His only offer of proof is an excerpt of a transcript, Doc. 36-4, where AUSA Koliner stated there was "bad blood" and "animosity" between Picardi and Kohn when speaking with the judge who presided over the case in discussing a potential juror related to Kohn.  This information is too limited to establish any sort of dispute between the two that was so dire as to have influenced the investigation into Picardi's crimes.

Case law weighs against disclosure of grand jury material.  See, e.g., Cunningham v. Holder, 842 F. Supp. 2d 338, 344 (D.D.C. 2012) (holding Rule 6 prohibited disclosure of grand jury material); Lopez v. Dep't of Just., 393 F.3d 1345, 1349 (D.C. Cir. 2005) ("This Court recognized long ago that requests for documents related to grand jury investigations implicate

FOIA's third exemption, because Rule 6(e) of the Federal Rules of Criminal Procedure prohibits government attorneys and others from disclos[ing] a matter occurring before the grand jury."); Sanders v. Obama, 729 F. Supp. 2d 148, 156 (D.D.C. 2010), aff'd sub nom. Sanders v. U.S. Dep't of Just., No. 10-5273, 2011 WL 1769099 (D.C. Cir. Apr. 21, 2011) ("[A] grand jury transcript itself epitomizes the sensitive details of the proceedings that Congress sought to keep protected. To disclose a transcript would be to disclose the inner workings of the grand jury, which is prohibited."). The question in determining whether to disclose grand jury material is "whether disclosure of the information requested would tend to reveal some secret aspect of the grand jury's investigation, such matters as the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation, the deliberations or questions of jurors, and the like." Lopez, 393 F.3d at 1349 (cleaned up and citation omitted). Certainly, divulging the material Picardi requests regarding Kohn's role, if any, in his prosecution would identify matters "secret" before the grand jury, such as witnesses, the substance of the testimony or strategy of the investigation.

Regarding Picardi's 2005 testimony to a grand jury, Defendants have offered an affidavit from the court reporter, Jean Marie Carlson, who took notes during that 2005 grand jury proceeding. Doc. 58. She declares that she did not transcribe that particular grand jury proceeding. Doc. 58. Therefore, even if the exemption did not apply, Defendants have met their burden of proving the record is "unidentifiable," and thus have discharged their duty under the FIOA. See Miller, 779 F.2d at 1385 ("The fact that a document once existed does not mean that it now exists; nor does the fact that an agency created a document necessarily imply that the agency has retained it. Thus, the Department is not required by the Act to account for documents which the requester

has in some way identified if it has made a diligent search for those documents in places in which they might be expected to be found.").

**2. Exemption 6 and 7**

The other exemptions Defendants claim in the Vaughn index relate to 5 U.S.C.A. § 552(b)(6) and (7)(c), which prohibit disclosure of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy" and "records or information compiled for law enforcement purposes" to the extent the information "could reasonably be expected to constitute an unwarranted invasion of personal privacy." Doc. 53 at 29. The Supreme Court of the United States has said that exemption 7(c)

> requires us to protect, in the proper degree, the personal privacy of citizens against the uncontrolled release of information compiled through the power of the State. The statutory direction that the information not be released if the invasion of personal privacy could reasonably be expected to be unwarranted requires the courts to balance the competing interests in privacy and disclosure."

Nat'l Archives & Recs. Admin. v. Favish, 541 U.S. 157, 172 (2004). "[U]nless access to the names and addresses of private individuals appearing in files within the ambit of Exemption 7(C) is necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity, such information is exempt from disclosure." SafeCard, 926 F.2d at 1206. "[T]he requester must establish more than a bare suspicion in order to obtain disclosure. Rather, the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred." Nat'l Archives, 541 U.S. at 174 (cleaned up and citation omitted) (reasoning that "allegations of government misconduct are easy to allege and hard to disprove so courts must insist on a meaningful evidentiary showing").

Defendants' declaration from Justin Wilkinson, an attorney-advisor with the EOUSA, states that "[a]ll responsive records related to Plaintiff's FOIA requests were processed to achieve

maximum disclosure consistent with the provisions of FOIA." Doc. 55. Additionally, the declaration attests that "the information sought to be protected are the names, personal schedules, telephone numbers and other personally identifiable information private individuals, other than Plaintiff, who are in some way connected with the investigation into Plaintiff." Doc. 55 at ¶ 24. The declaration states that the EOUSA withheld information to uphold the privacy interests of individuals or private entities named that may have been involved in, or victims of, crimes related to Picardi's prosecution. Doc. 55 at ¶ 25.

This Court agrees with the Defendants that "disclosure of [personal identifying information] could subject individuals to an unwarranted invasion of their personal privacy by leading to efforts to contact them directly or subject them to harassment or harm" and "might lead to retaliation against those individuals." Doc. 55 at ¶ 24; see Nat'l Archives, 541 U.S. at 166 ("Law enforcement documents obtained by Government investigators often contain information about persons interviewed as witnesses or initial suspects but whose link to the official inquiry may be the result of mere happenstance. There is special reason, therefore, to give protection to this intimate personal data, to which the public does not have a general right of access in the ordinary course."). Defendants have stated, via sworn statements, that no records exist in relation to the impropriety alleged in the investigation by Picardi regarding the Zimmionds or Kohn. Therefore, Picardi has not established an entitlement to any additional information contained within the Vaughn index.

Because the EOUSA's search producing 7,555 pages of documents for Picardi's review, Doc. 53, was reasonable and Defendants' Vaughn index establishes that certain exemptions from 5 U.S.C.A. § 552(b) apply to withhold documents, this Court finds that the Defendants have discharged their duty under the FOIA.

## IV. Conclusion

For the reasons explained above, it is hereby

ORDERED that the Defendants' Second Motion for Summary Judgment, Doc. 52, is granted.

It is further

ORDERED that Picardi's motion to compel disclosure and to refrain from dismissal, Doc. 51,

is moot.

DATED this 16th day of December, 2021.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE